No. 18,941.

THE GRAND LODGE OF THE ANCIENT ORDER OF UNITED WORKMEN OF KANSAS, *Appellant*, v. THE STATE BANK OF WINFIELD, *Appellee.*

SYLLABUS BY THE COURT.

1. BANKS AND BANKING—*Payment of Checks Payable to Order.* The general rule is that in order to charge the account of a depositor a bank must pay a check only to the payee to whose order it is drawn, and payment made otherwise is at its peril unless it can claim protection upon some principle of estoppel or negligence chargeable to the depositor.

2. SAME—*Forgery of Name of Payee by Agent of Depositor— Notice to Depositor.* Where the claim of negligence of the depositor is based upon previous forgeries of his agent, who forged the endorsement of the payee upon which the check in question is paid, knowledge of the depositor or notice to him of the former misconduct or other fraudulent acts of the agent must be shown in order to charge the depositor with negligence in intrusting the check to the agent for delivery to the payee.

3. SAME—*False Reports and Forgeries by Financier of Local Lodge of A. O. U. W.* The financier of a subordinate lodge of a beneficiary association at different times sent in to the grand lodge false reports of the death of members, and forged proofs of death, and by these means obtained possession of checks or orders on the depository of the grand lodge, drawn to the order of the beneficiary, and thereupon, by forging the indorsements of the payees, received and appropriated the proceeds. He continued, however, to enter upon a ledger of his lodge the regular payment of dues and assessments by the members so reported dead. Afterwards by like forgeries he obtained payment of another check or order which had been sent to him by the grand lodge for delivery to the payee named in it. In this action of the grand lodge against the depository to recover the amount so paid on the forged indorsement of the payee it is held that the grand lodge is not chargeable with notice of the former forgeries by the entries so made in the financier's ledger, which were never reported to, and never came to the knowledge of, the grand lodge or any of its officers.

United Workmen v. Bank.

4. SAME—*Notice of Forgeries to Agent—Not Notice to Grand Lodge.* The knowledge of the agent of forgeries committed by him, in the circumstances stated in the last paragraph, does not charge the grand lodge with notice of such forgeries.

5. SAME—*Examination of Books of Subordinate Financier by Grand Lodge Officers.* In the absence of any knowledge or suggestion of misconduct of the financier, the grand lodge was not bound to examine his books to detect fraud of which its officers had no suspicion, but might rely upon the regular reports of the auditing committee of the local lodge, which afforded no clue to the forgeries or misconduct of the financier.

6. SAME—*Forgery of Indorsement on Check—Not Within the Scope of Agency.* The forgery of the indorsement of the name of the payee upon a bank check is not within the scope of the employment or duty of an agent of the drawer to whom the check is intrusted for delivery only to the payee.

Appeal from Cowley district court; CARROLL L. SWARTS, judge. Opinion filed July 7, 1914. Reversed.

*Edgar Bennett,* of Washington, *A. M. Jackson,* and *A. L. Noble,* both of Winfield, for the appellant.

*G. H. Buckman, S. C. Bloss,* both of Winfield, and *A. L. Cooper,* of Kansas City, Mo., for the appellee; *Hadley, Cooper & Neel,* of Kansas City, Mo., of counsel.

The opinion of the court was delivered by

BENSON, J.: This action is to recover money paid by the defendant bank on the forged endorsement of a check. The forgery is admitted, and the defense is based upon the alleged negligence of the drawer in entrusting the check to its agent for delivery, who forged the endorsement and received the payment.

The plaintiff is a fraternal order having subordinate lodges and issuing beneficiary certificates. The defendant bank is its depository. At the time of the transactions involved in this action M. M. Mishler was financier of Mulford lodge at Atchison. Charles H. Thompson was, and still is, a member of that lodge, holding a beneficiary certificate. On March 5, 1912,

Mishler sent to the grand lodge a notice that Thompson had died on March 2; that Cyrus Thompson was the beneficiary; and that the certificate had been misplaced. The notice was signed by Mishler as financier and purported to be signed by the master workman and recorder of the local lodge whose names were forged. Blanks for proofs of death were sent to Mishler. On March 8 the grand recorder received at his office in Emporia purported proofs of death consisting of forged affidavits, certified to by Mishler as sworn to before him, and reports of death purporting to be signed by the local lodge officers. The papers were in due form, were approved by the medical examiner, and a check for $2000, dated March 12, was drawn upon the grand receiver, payable out of the beneficiary fund at the defendant bank, to the order of Cyrus H. Thompson, describing him as the brother of Charles H. Thompson, deceased. The check and a blank form of affidavit of loss of the certificate and blank receipt were mailed by the grand recorder, with instructions, to Mishler as financier of Mulford lodge. On March 15 Mishler presented the check at the First National Bank of Atchison, bearing the purported endorsement of Cyrus Thompson, and also his own endorsement, and received payment. The check was forwarded through other banks in the usual course of business and was paid by the defendant bank through the clearing house at Winfield where it is located. The check was returned as a voucher to the grand lodge in a statement made by the defendant March 25, 1912. The signature of Cyrus Thompson was forged upon the endorsement, and to the affidavit of loss of the certificate, and to the receipt. The forged affidavit and receipt were returned to the grand lodge by Mishler who committed all these forgeries. On June 28 the grand lodge found that Charles H. Thompson was living, its officers accused Mishler of the forgeries, and he then killed himself. It was soon discovered that by means of like forgeries Mishler had received

and appropriated the amounts of four other certificates of living members between February 10, 1910, and the date of the Thompson check. Collections were made twice on one of these certificates, the vouchers designating the holder in one set of vouchers by the initials of his Christian name and in the other by the name in full. In the same manner Mishler received the amount of the certificate of another living member after the Thompson transaction. After receiving payment on these forged vouchers, Mishler, as financier of Mulford lodge, regularly entered the payment of the dues and assessments of the members so reported dead upon the ledger, a record of Mulford lodge, kept pursuant to a rule of the grand lodge. He did not, however, report or pay over such dues and assessments to the receiver of Mulford lodge although a by-law required him to do so at each meeting. A by-law also provided for an examination and audit of the books of the financier, recorder, and receiver of the local lodge in June and December of each year, by the auditing committee, and a written report thereof at the next stated meeting. These reports were regularly made, but the committee did not examine the financier's books, accepting instead a statement submitted by Mishler which did not show the payments entered upon his books after the reported deaths of members. As these amounts so entered were not paid over to the receiver, the reports of that officer did not show them. The by-laws also required reports from the local lodge to the grand lodge in January and July of each year showing, among other things, the dates of the death of members since the last report, the number of beneficiary certificates held by each, and the receipts and disbursements of beneficiary fund and general fund.

The following provisions are in the by-laws of the grand lodge:

"Upon the death of any member in good standing, it shall be the duty of the subordinate lodge of which he was a member to prepare and forward immediately to

the. Grand Recorder proofs of such death, which shall be attested by the seal of the subordinate lodge and signed by the Master Workman, Financier and Recorder of said lodge. . . .

"The Grand Recorder shall furnish to the Recorder of any subordinate lodge, free of charge, blank death proofs, on receipt by him of notice from said Recorder of the death of a member of that lodge. . . .

"In transmitting orders on the beneficiary fund the Grand Recorder shall send the same to the Recorder of the· subordinate lodge to which the deceased member belonged, with full instructions as to the disposition thereof.

"The Recorder of said lodge shall see that the warrants so transmitted are at once placed in the hands of those entitled to receive the same, and that the beneficiary certificate held by the deceased member is properly receipted and attested by two witnesses who shall give their postoffice address, and shall then take up said certificate and immediately forward it to the Grand Recorder."

The contract with the depository contained the following:

"No moneys placed to the credit of the Grand Lodge of Kansas with such depository will be withdrawn except in payment of orders issued on the Grand Receiver in accordance with the rules of the order, which orders will be payable at such depository, and will be charged to the account of the Grand Receiver; provided that on the joint order of the Grand Master Workman, Grand Recorder and Grand Receiver the entire .amount in hands of such depository may be withdrawn at any time, when they deem it necessary for the best interest of the order."

The contract provided for the payment of interest to the grand lodge on daily balances, and for monthly statements by the bank.

Among the instructions sent by the grand recorder to Mishler with the check were the following:

"You will please· deliver the same [check for $2000] to Cyrus Thompson on payment of the assessment for the month of March if not paid, and on receipt of

original beneficiary certificate of Brother Charles H. Thompson duly receipted on the back by Cyrus Thompson in the presence of two witnesses, who will subscribe their names thereto as such and give their place of residence.   .   .   .

"In addition to the usual letter of advice accompanying this letter we wish to state that if the beneficiary certificate of Brother Thompson has not been found, I enclose you an affidavit which have filled up, signed and sworn to by Cyrus Thompson, the beneficiary named in the certificate issued to our late brother, Charles H. Thompson.

"I enclose you receipt for him to sign also properly witnessed.   On receipt of the affidavit and the receipt properly signed, you are authorized to deliver to him the order issued in payment of the death loss."

Mishler was the most active member of Mulford lodge, and assumed to take charge of its interests and welfare more than any other person.   He attended to most of the correspondence of the lodge.   He was well known in Atchison and by the officers of the First National Bank, where he had good credit.   The bank knew that he was financier of Mulford lodge, and knew his signature.   At different times he had a personal account with the bank, and until June, 1912, had an account as lodge treasurer.   He took two drafts payable to his own order and credit for $100 on his account as treasurer, in payment of the check.

The grand recorder testified that in the majority of cases the local recorder sends in notice of death, and that blank proofs are sent to him, but when the notification comes from some other member the blank proofs are sent to that other member; that there was no absolute rule in such cases, and that when sufficient proof is received the draft is generally sent to the person in the local lodge who conducts the correspondence.

The grand lodge keeps a list of members, and when a member is reported dead the fact is recorded in its books.

56—92 KAN

The Atchison bank did not know Cyrus Thompson or his signature, and when it advanced payment upon the check it made no inquiry as to the genuineness of the endorsement of the payee, but recognized the signature of Mishler below it. The defendant bank paid the check on the guarantee of the previous endorsements.

There is no dispute about the facts. The plaintiff contends that it was the duty of the defendant bank to pay only on the endorsement of the payee, who was a real person. (*Kohn v. Watkins,* 26 Kan. 691.) It was held in the case cited:

"Where a draft or bill of exchange is made payable to a real person, known at the time to exist, and present to the mind of the drawer when he makes it, as the party to whose order it is to be paid, such draft or bill must bear the genuine indorsement of such payee in order that a *bona fide* holder may recover thereon, although the bill is drawn without the knowledge or consent of the payee through the false representations of a party obtaining it from the drawer by fraud." (Syl. ¶ 1.)

Commenting on that decision afterwards, it was said in *National Bank v. Shotwell,* 35 Kan. 360, 11 Pac. 141:

"There, the draft was sent by Watkins to his correspondent, McLain, to be delivered to the payee thereof, Michael A. Becker. McLain forged the name of Becker upon the draft, then indorsed his own name thereon and negotiated the same. The draft was never delivered as Watkins had given instructions. He never intended it to be paid to McLain, to whom it was sent. McLain, the correspondent, was solely responsible for the fictitious application and the forgery." (p. 374.)

The general rule, that in order to charge the account of the depositor a bank must pay only to the payee named in the check, or to his order when so drawn, is conceded (2 Morse on Banks and Banking, 3d ed., § 432), but the defendant contends that it should have credit for the payment in this instance under an exception to that rule recognized in the common law and expressed in section 30 of the negotiable-instruments law (Gen. Stat. 1909, § 5276). It is declared, in sub-

stance, in that section that no right of discharge can be acquired by payment of a forged instrument unless the party against whom it is sought to enforce such right is precluded from setting up the forgery or want of authority. The rule appears to be that payments upon forged endorsements are at the peril of the bank making them unless it can claim protection upon some principle of estoppel or negligence chargeable to the depositor. (*Shipman et al. v. Bank S. N. Y.*, 126 N. Y. 318, 327, 27 N. E. 371.) The negligence relied upon here is the conduct of the grand lodge in sending the check to Mishler for delivery to the payee instead of the recorder as the by-laws provided. This charge is predicated on the previous forgeries of Mishler, from which it is argued that a like criminal course with respect to this check should have been anticipated and guarded against. The application of the principle contended for must depend upon knowledge of the grand lodge or notice of the previous forgeries. It is undisputed that no officer or agent of the grand lodge had any actual knowledge of any of these forgeries until some time after the payment of this check, when it came to them as a great surprise. The knowledge of Mishler himself of his own criminal acts is not binding upon the grand lodge. (*Shipman et al. v. Bank S. N. Y.*, supra, pp. 329, 330.) Such acts being in fraud of the principal and not within the scope of his agency, are not notice to it. (*United States v. National Bank of Commerce*, 205 Fed. 433.) Knowledge of an agent of his own wrong is not the knowledge of his principal. (2 Morse on Banks and Banking, 3d ed., § 472.) It is argued that the entries in the ledger of Mulford lodge of payments by men reported dead were notice to the grand lodge that the men were still living, and notice of Mishler's previous forgeries. It may be conceded that the entries of such payments would be notice to the grand lodge as between the order and the member, and possibly in other cases (*Pyramids v. Drake*, 66 Kan.

538, 72 Pac. 239), but can the rule be stretched to the extent necessary to protect the bank from liability for the unauthorized payment in this case? It was formerly held that a depositor owed a bank no duty to examine his pass book and vouchers to detect forgeries although the means of detection were thus afforded (*Weisser v. Denison*, 10 N. Y. 68), but recent decisions hold otherwise (*Morgan v. U. S. Mortgage & Trust Co.*, 208 N. Y. 218, 101 N. E. 371; Note, 7. L. R. A., n s., 744). The modern rule is stated by Judge Harlan, in *Leather Manufacturers' Bank v. Morgan*, 117 U. S. 96:

"The sending of his pass-book to be written up and returned with the vouchers, is, therefore, in effect, a demand to know' what the bank claims to be the state of his account. And the return of the book, with the vouchers, is the answer to that demand, and, in effect, imports a request by the bank that the depositor will, in proper time, examine the account so rendered, and either sanction or repudiate it." (p. 106.)

The object of requiring such an examination is to afford seasonable notice to the bank of any unauthorized payment in order that it may have an opportunity to retrieve against losses. This principle has been extended to the payment of checks entrusted to an agent, after his misconduct had been revealed by a return of vouchers and statement of the account. No statements or reports showing the prior forgeries were received by the grand lodge. The reports regularly sent in by Mulford lodge contained no clues to the forgeries. As between the grand lodge and its depository we know of no rule of diligence requiring an examination of the ledger of a subordinate lodge in order to ascertain whether some officer of the latter is transacting his business honestly, in the absence of any notice or suggestion of dishonesty. Negligence can not be imputed for failure to discover fraud which an examination might have disclosed, unless as between the parties affected ordinary diligence required such an examination. While it is true that prior payments

made upon endorsements were shown by the monthly statements of the bank, and checks returned to the grand lodge, still there is no proof or presumption that it knew the signatures of the payees, and in the absence of any information to the contrary, it could rely upon the genuineness of the endorsements. It was said in *Leather Manufacturers' Bank v. Morgan,* 117 U. S. 96:

"As the depositor was not presumed to know, and as it did not appear that he in fact knew, the signature of the payee, it could not be said that he was guilty of negligence in not discovering, upon receiving his passbook, the fact that his clerk, or some one else, had forged the payee's name in the endorsement." (p. 117.)

Although the defendant paid the check on the faith of prior endorsements, it may without resorting to the liability of such endorsers have the protection of any defense the Atchison bank might have made, and is subject to the same responsibility. (*Harmon v. Old Detroit Nat. Bank,* 153 Mich. 73, 116 N. W. 617, 17 L. R. A., n. s., 514.) Circuity of action is thus avoided.

The Atchison bank took the check without inquiry as to the endorsement of the payee; having faith in Mishler it accepted his endorsement as a sufficient guaranty that the endorsement of the payee was genuine. This presents the crucial question, whether the direction to Mishler to deliver the instrument to Cyrus Thompson gave him authority to identify Thompson's signature at the bank. So far as the agent acted within the directions, that is, within the scope of his agency, the lodge is bound, although he acted fraudulently. (Story on Agency, 9th ed., § 452; Mechem on Agency, § 740; 31 Cyc. 1582.) But if beyond that authority he acted fraudulently or committed a crime the grand lodge is not bound, nor is notice of such frauds imputed to it. (*Shipman et al. v. Bank S. N. Y.,* 126 N. Y. 318, 331, 27 N. E. 371; *United States v. National Bank of Commerce,* 205 Fed. 433, 438.) The views of this court upon the general subject of the crimes or torts

of an agent are stated in *Sachrowitz v. A. T. & S. F. Rld. Co.,* 37 Kan. 212, 15 Pac. 242; *Laird v. Farwell,* 60 Kan. 512, 57 Pac. 98; *Clark v. Folscroft,* 67 Kan. 446, 73 Pac. 86, and *Crelly v. Telephone Co.,* 84 Kan. 19, 24, 113 Pac. 386.

It was said in *Crawford v. West Side Bank,* 100 N. Y. 50, 2 N. E. 881:

"The theory that a party who makes and issues commercial paper, properly and carefully drawn, to express the liability which he intends to assume, is chargeable with negligence on account of the criminal act of another in altering it after its issue, would render him a warrantor against such acts and is repugnant to justice and reason." (p. 55.)

It is argued that because the contract provided that money should be withdrawn only on orders issued in accordance with the rules, and that a rule required that orders on the beneficiary fund should be sent to the recorder of the local lodge, the bank should be acquitted of this charge, the order in this instance having been sent to the financier instead of the recorder. The bank had an interest in holding possession of the beneficiary fund, and stipulated that it could only be withdrawn as provided by the rules by which it was set apart for death losses. The contract guarded against withdrawal otherwise. It would be a strained construction of the contract to hold that the bank could refuse payment of an order on that fund merely because it was mailed to a different person than the one named in the rule. The rule in this respect could be modified without affecting the legal rights of the depository.

The endorsement was not within the scope of Mishler's duty. It was made afterward and was an independent act. The defendant's argument upon this branch of the case is that having been directed to deliver the check to Thompson, the payee, it became Mishler's duty to identify him. True, there must be identification in order to make the delivery, but the duty ended there. Had the delivery been made, the service

required would have been completely performed. No further duty was suggested by the instructions or necessary for the payment of the claim undertaken by the grand lodge except to procure the affidavit and receipt. Had the check been delivered to Thompson—who, it must be remembered, was an actual and not a fictitious payee—and by some mischance it had come again into the hands of Mishler and he had then forged the endorsement it would not be contended that the grand lodge would be bound. It is not perceived how his failure to deliver the check changes the legal effect of the agent's misconduct. In either case the forgery was beyond the scope of his employment.

A situation similar to the facts of this case appeared in *Second Nat. Bk., Appellant, v. Trust & S. D. Co.,* 206 Pa. St. 616, 56 Atl. 72. A bank paid a check to one who presented it under a forged endorsement. It had been drawn by a beneficiary association payable to the order of the brother of a member supposed to be dead. The endorsement was forged. The bank paying the check was the depository of the order. In a suit by the association to recover the amount charged against its account, an affidavit of defense alleging that the check had been drawn without due precaution, inasmuch as the beneficiary was living, was held insufficient. The court said:

"We fail to see any relevancy whatever in the suggestion that the beneficial order was negligent in issuing a draft to pay a death benefit for a member who was yet alive. That is not the point in this case. Whether or not it failed to make due inquiry matters not in this proceeding. That would go only to the question of consideration as between the order and the beneficiary. Upon what it considered satisfactory proof, the order drew its draft upon the bank for a sum of money, payable to the order of John Davis. It had a right to require that its direction in this respect should be carried out. The draft was payable only upon the order of John Davis. And until John Davis did actually order or direct the payment of a draft to some one else, the title to the instrument remained in him, and

never properly passed from him. When the defendant therefore took the draft without knowing whether or not the signature of John Davis, which appeared upon the back of the draft, was genuine, it took the instrument at its own peril." (p. 620.)

The defendant distinguishes that case by the fact that there was no evidence that the association had been negligent, because the agent to whom the check had been entrusted for delivery was the proper person, and there was no evidence that he had ever before been guilty of any wrongdoing. The grand lodge, as already stated, could modify its rule requiring checks to be delivered by the recorder of the local lodge, as it had often done. The duty of the depository was to pay only upon the order of the payee, unless it can invoke the protection of estoppel or such negligence of the depositor as will be a sufficient defense. This negligence must relate to some duty which the grand lodge owed to the bank. As already stated, it was not required, in the absence of any notice or information, to explore the books of Mulford lodge which furnished the clue to Mishler's previous guilt, but might rely upon the presumption of his honesty. In the absence of notice or knowledge either to the grand lodge or the bank, the former forgeries were wholly unrelated to this transaction. (*Dodge v. The National Exchange Bank,* 20 Ohio St. 234.)

In *Hardy & Bros. v. Chesapeake Bank,* 51 Md. 562, 34 Am. Rep. 325, the questions of negligence and estoppel in relation to the payment of forged checks was elaborately considered. A confidential clerk had forged a series of checks. After discovery of the fraud a suit was brought by the depositor against the bank to recover the amount. The return of the pass-book and forged checks was referred to and the duty of the depositor to make the usual examination was stated. The court said that it was a question of fact whether the depositor had knowledge of the forgeries, or failed to obtain information from sources of information readily

accessible, which by the exercise of reasonable diligence might have been obtained, and added:

"If such facts be found to exist, then it must be also found, in order to work an estoppel, that the appellee acted, in honoring and paying the nine checks in question, in reference to the conduct of the appellants in failing to make known an objection to the account as stated . . . and that such omission and neglect of the appellants did in fact mislead the appellee into the error of paying the nine forged checks now in dispute.

"This doctrine of estoppel *in pais* is applied in a great variety of circumstances, but its great object is to prevent injustice being done, where one party has been led into error by the fault or fraud of the other. It is a most valuable doctrine for the promotion of justice; but it can have no application except where the party invoking it can show that he has been induced to act or refrain from acting, by the acts or conduct of the adverse party, under circumstances that would naturally and rationally influence ordinary men. . . . And in the recent case of *Arnold v. The Banks*, L. Rep., 1 C. P. Div., 578, where the principle was extensively discussed as to its application to the negligent conduct of the party suing, it was held, following the previous cases, that negligence, to create an estoppel, must be in the transaction itself, and be the proximate cause of leading the third party into mistake, and also must be the neglect of some duty which is owing to such third party, or to the general public." (*Hardy & Bros. v. Chesapeake Bank,* 51 Md. 562, 589, 591.)

The material transaction of the depositor in this case consisted in intrusting the check to Mishler for delivery. That of itself could not mislead the bank into a mistake. The mistake was caused by reliance upon Mishler's indorsement as a guaranty of the genuineness of the payee's indorsement, a matter not within Mishler's employment or duty, but apart therefrom.

It is suggested that the alleged negligence of the grand lodge was a question of fact concluded by the finding of the jury. That would be true if the facts were disputed or there was room for different inferences—a situation not presented here. Payment having

been made upon a forged indorsement, the burden was upon the defendant to prove facts sufficient to avoid liability to the depositor. The facts proven are insufficient.

Among the cases cited in support of the defense is *McHenry v. National Bank,* 85 Ohio St. 203, 97 N. E. 395. A stranger was introduced to a money lender as George Thresh, who asked for a loan on a farm. On examination of the record the title to the farm was found to be in George Thresh. Later the loan was agreed upon, a mortgage was made, and a check was delivered to Thresh, payable to his order, and upon his indorsement was paid by the bank. It was afterwards discovered that the farm belonged to another George Thresh, who knew nothing of the transaction. The suit was by the drawer of the check against the bank to recover the money, on the theory that it had been paid on a forged indorsement, but the action failed because the money was paid to the very person to whom the check had been delivered as payee by the drawer. The same result was reached in *Land Title & Trust Co. v. Bank,* 196 Pa. St. 230, 46 Atl. 420, 50 L. R. A. 75; *Russell v. First Nat. Bank of Hartselle,* 2 Ala. App. 342, 66 South. 868; *Weisberger Co. v. Savings Bank,* 84 Ohio St. 21, 95 N. E. 379; *James Maloney v. Clark & Co.,* 6 Kan. 82; *National Bank v. Shotwell,* 35 Kan. 360, 11 Pac. 141. In each of these cases the drawer of a check was misled as to the identity of the payee, but the indorsement was made by, and the money paid to, the very person to whom the check had been drawn and delivered by the drawer. In this case no such delivery had been made, and the payee was not an impostor and his identity is not questioned. In the cases referred to the drawer made the first mistake, from which the loss resulted. Here no mistake was made; the check was intended for Cyrus Thompson. The fact that the grand lodge had been fraudulently induced to write it does not affect the legal rights of

the bank. (*Second Nat. Bk., Appellant, v. Trust & S. D. Co.*, 206 Pa. St. 616, 56 Atl. 72.) The case of *London Life Ins. Co. v. Molson's Bank*, 5 Ont. L. Rep. 407, is quite similar in many of its facts to this, but differs in at least one important respect. The insurance company had notice of former extensive forgeries of the same nature by its agent when it sent to him the checks in question. Here, as we have seen, notice of the former forgeries is lacking.

Valuable notes relating to various phases of the general subject discussed in this opinion are contained in 7 L. R. A., n. s., 744, 17 L. R. A., n. s., 514, and 41 L. R. A., n. s., 529.

The instrument upon which the endorsement was forged has been referred to as a check. The defendant calls attention to the fact that its language differs from that of an ordinary check by a designation added to the name of the payee. The order is to "pay to the order of Cyrus Thompson (brother) of Brother Charles H. Thompson deceased, late member of Mulford Lodge, No. 137, located at Atchison, Kansas." It is also made payable out of the beneficiary fund. The language quoted is referred to as evidence of a special arrangement showing a relation with the bank different from that of debtor and creditor ordinarily existing between banker and depositor. We conclude, however, that the instrument has the legal effect of an ordinary bank check. The descriptive words suggested means of identification of the payee. For that purpose they were beneficial to the bank. (See, also, *Bank v. Lightner*, 74 Kan. 736, 88 Pac. 59.)

With great industry and ability counsel for both parties have presented arguments and quoted extensively from the decisions of many courts pertinent to this controversy, but enough citations have already been made in this opinion to illustrate, and as we believe to support, the views expressed.

The judgment will be reversed, with directions to render judgment for the plaintiff for the amount of the check with interest from the date of the demand for payment.